**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **DAVID GEVAS (B-41175),** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Case No. 21 C 50272** |
| v. | ) |
| | ) **Hon. Rebecca R. Pallmeyer** |
| **JOHN VARGA, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM OPINION AND ORDER**

Illinois prisoner David Gevas alleges in this case that he was subjected to unconstitutional living conditions at the Dixon Correctional Center from April 2019 to October 2021, in violation of 42 U.S.C. § 1983 and state law. *See* 3d Am. Comp. [20]; Jan. 3, 2022 Screening Order [19]; July 1, 2024 Order [204]. Gevas named, as Defendants, former Wardens John Varga, Sonja Nicklaus, and Justin Wilks, alleging that these prison officials are responsible for the conditions. The Wardens denied the allegations and have moved for summary judgment on Gevas's Eighth Amendment claim. [240, 241]. They also ask the court to dismiss the state-law claims as barred by Sovereign Immunity. *Id.* Gevas declined to respond to the motion and, for the following reasons, it is granted.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on such a motion, the court considers relevant, properly supported evidence in the light most favorable to the non-moving party and draws reasonable inferences in the non-moving party's favor. *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (citation omitted). "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks omitted).

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this court. The Rule requires the moving party to submit a motion, supporting memorandum of law, and statement of material facts accompanied by cited evidentiary material. N.D. ILL. L.R. 56.1 (a), (d). The opposing party then must respond to the moving party's motion and statement of facts, also providing evidentiary material in support of its denials and of any competing statements. N.D. ILL. L.R. 56.1(b), (e). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *See* N.D. ILL. L.R. 56.1(e)(3).

Gevas did not respond to the Wardens' motion for summary judgment by the deadline set by this court, despite ample opportunity to do so. *See* [267, 269]. He is a frequent and capable litigant, and was provided with the appropriate notice advising of what he needed to do to oppose summary judgment [244]. The court warned that it would proceed to rule on the motion without his input if he failed to respond [267]. As he has explicitly declined to do so [269], the court deems the facts set forth in the Wardens' Statement of Undisputed Material Facts, if appropriately supported, admitted. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012) (crediting defendant's facts where plaintiff did not respond to defendant's L.R. 56.1 statement of facts); *Smith v. Cipolla*, No. 23-2085, 2024 WL 5102485, at *1 (7th Cir. Dec. 13, 2024) ("Because [the plaintiff] failed to respond to the defendants' statement of facts, the judge appropriately exercised his discretion to treat the defendants' facts as admitted."). The court also considers any arguments Gevas might make in opposition to the Wardens' motion as having been waived. *See Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

**BACKGROUND**

This lawsuit concerns the living conditions in Dixon Correctional Center's housing units 26, 31, 35, 42, 112 and the "Health Care Unit Infirmary" from April 2019 to October 2021. Gevas alleged in the operative complaint [20] that conditions in these units put his health at risk. Plaintiff's allegations are not evidence, but the court refers to them here to provide context for the Wardens' arguments.

Gevas alleged that at various times since April 2019, he was housed in Units 26, 31, 35, 42, 112, as well as the infirmary. According to Gevas, the conditions in these housing units were troubling. Roofs of the units were in disrepair, and water leaked through gaps in the ceilings, leaving puddles on the floors including, in Units 42 and 112, near the entry to Gevas's cells. Gevas alleged that that the showers were filled with "mold, filth, and slim[e]," the shower curtains were falling apart, and ventilation systems in the showers were inoperable and contaminated with "mold and filth." Inmates assigned to clean the showers were not provided with "proper cleaning supplies"; instead, cleaning "chemicals" were "watered down," resulting in the showers being "a breeding ground for disease, bacteria, and viruses."

Gevas was not provided with supplies necessary to clean his own cell, either. He alleged that ventilation systems in the housing units, like those in the showers, were "dirty" and either did not function or blew "filthy" air into the living spaces, causing "eyes to water, itch, [and] burn," nasal congestion, and "respiratory problems that make it hard to breath[e] and cause coughing."

Doors to the facility, Gevas asserts, were rotted out at the bottom, and windows did not close correctly or were missing entirely. Consequently, cold air and pests—spiders, ants, mice, birds, and raccoons—entered the common areas and cells. For example, while Gevas was housed in Unit 35 (in a COVID-19 isolation cell) from November 12, 2020 to November 26, 2020, he alleges that the window in his cell could not be fully closed and the door, rotten near the floor, allowed a gap beneath the door. Cold air flowed over him while he was sleeping and, he alleges,

worsened his COVID-19 symptoms. Gevas's cells in Units 26 and 42 also were infested with ants that entered his cells through broken windows and bit him while he slept. His cells were sprayed twice in June and July 2021 to exterminate the ants, but the ants returned.

Gevas alleges that Wardens Varga, Nicklaus, and Wilks were aware of the overall condition of the prison because the Wardens received monthly safety and sanitation reports from prison medical staff. Yet the Wardens did not address the conditions and, as a result, Gevas alleges, he contracted infections in his legs between July 2019 and May 2020. The court found these allegations sufficient, for pleading purposes, to state an Eighth Amendment claim against the Wardens in their individual capacity and a claim for prospective relief against Warden Wilks in his official capacity [19]. The court also allowed a state-law negligence claim to proceed. *Id.*

In their motion for summary judgment, the Wardens deny that they were "deliberately indifferent to Plaintiff's alleged cell conditions or the conditions of the facility as a whole." (Def. Mem. in Supp. of Mot. for Summ. J. [240] at 2.) They have presented evidence that on April 24, 2019, Gevas was transferred to Dixon Correctional Center. (Def. L.R. 56.1(a) Stmt. of Facts (DSOF) [243] ¶ 7.) Records show that during the time period relevant to his claims in this case, Gevas was assigned to the following cells:

| | |
|---|---|
| April 24, 2019 – May 24, 2019 | Unit 31, Cell 5 |
| May 24, 2019 – August 21, 2019 | Unit 42 |
| August 21, 2019 – November 4, 2019 | Unit 26, Cell 70 |
| November 4, 2019 – January 22, 2020 | Unit 26, Cell 45 |
| January 22, 2020 – November 12, 2020 | Unit 42, Cell 19 |
| November 12, 2020 – November 26, 2020 | Unit 35, Cells 14 & 49 |
| November 26, 2020 – December 3, 2020 | Unit 42, Cell 19 |
| December 3, 2020 – December 8, 2020 | Unit 42, Cell 14 |
| December 8, 2020 – September 22, 2021 | Unit 42, Cell 19 |
| September 22, 2021 – September 23, 2021 | Unit 112, Cell 4 |
| September 23, 2021 – June 7, 2022 | Unit 112, Cell 20 |
| June 7, 2022 – June 16, 2022 | Unit 41, Cell 29 |
| June 16, 2022 – October 19, 2022 | Unit 112, Cell 20 |

DSOF ¶¶ 7-14. Cells 14 and 49 in Unit 35 were quarantine cells, where Gevas was housed while being treated for COVID-19. DSOF ¶¶ 12, 28. Except for Gevas's time in the quarantine cells,

he was housed in Unit 42, Cell 19 for nearly all of the time from January 2020 through September 2021. DSOF ¶¶ 7-14.

As relevant to this lawsuit, the Warden at Dixon—John Varga from June 2016 to January 2020, Sonja Nicklaus from January 2020 to April 30, 2021—is responsible for monitoring the facility for effective operation and completing inspections of the overall physical plant, equipment, and grounds for safety, security and sanitation. DSOF ¶¶ 4, 5, 21. The Assistant Warden of Operations (Justin Wilks from April 2017 to May 31, 2022, who also served as Acting Warden from May 1, 2021, to February 1, 2022[1]) is responsible for assisting the Warden with the daily operation of the facility; planning, organizing, and directing overall physical plant operations; and overseeing safety, health, sanitation, and security inspections of the facility. DSOF ¶¶ 6, 22. The Assistant Warden of Operations also has the title of Safety and Sanitation Coordinator. DSOF ¶ 16.

In their submissions, the Wardens describe policies for oversight of safety and security at Dixon: "To ensure that safety, sanitation, security and maintenance procedures are being implemented, the Chief Administrative Officer and designated administrative staff shall visit, and conduct scheduled and unscheduled inspections of the facility." DSOF ¶ 15 (quoting Ex. 6 to DSOF, Admin. Directive 01.02.103). IDOC policies call for monthly inspections of the Dixon Correctional Center and, following the inspections, submission of a Safety and Sanitation Report to the Chief Administrative Officer. DSOF ¶ 16. In addition, Weekly Safety and Sanitation Reports identified areas of the housing units "that have issues that need to be addressed." DSOF ¶ 17. Those Reports are audited twice a year (Defendants do not say by whom). DSOF ¶ 19.

---

[1] Defendant Nicklaus also was the Assistant Warden of Programs at Dixon from November 2016 through January 2020. DSOF ¶ 5. The Assistant Warden of Programs would assist with tours of the facility but was not responsible for overseeing maintenance of the facility or its overall physical condition. DSOF ¶ 23.

5

Warden Varga explained that the weekly Safety and Sanitation Reports were distributed at monthly Safety and Sanitation Meetings, overseen by a committee that typically included the Warden, the Assistant Warden of Operations, and the Assistant Warden of Programs. *See* DSOF ¶ 18. That committee was responsible for establishing the priority of repairs and ongoing projects in the prison. Ensuring that prisoners received "basic necessities like [] safe drinking water, heat, and shelter" took precedence over other maintenance matters. *Id.*

Each Warden submitted a Declaration confirming the facility's policy that, where any maintenance issue posed a serious or substantial risk to any prisoner's health or safety, that prisoner would be moved out of danger and placed in a safer part of the facility. DSOF ¶ 41. Similarly, each Warden stated that they were "not aware of the alleged maintenance issues in [Gevas's] complaint ever posing a serious or substantial risk to any inmates' health or safety." Dkt. 243-15 ¶ 10 (Nicklaus Declaration); *see* Dkt. 253-16 ¶ 6 (Varga Declaration); 243-17 ¶ 9 (Wilks Declaration).

Gevas has a history of both minor and more serious health conditions. *See, e.g.,* DSOF ¶¶ 24-34. He experiences allergies and rhinitis. DSOF ¶¶ 32, 34. During the relevant period, he was twice treated for cellulitis (July 2019 and September 2019) and once for COVID-19 (November 2020). DSOF ¶¶ 25, 26, 28. He also was prescribed an albuterol inhaler and used a CPAP machine for sleep apnea. DSOF ¶¶ 29, 33.

## **ANALYSIS**

The Wardens argue that they are entitled to summary judgment. With respect to Gevas's Eighth Amendment claim, Defendants contend that Gevas cannot establish the subjective component for that claim and cannot establish injury resulting from the alleged conditions. ([240 at 4-11.) They argue that Gevas's state-law claims for damages must be dismissed as barred by Sovereign Immunity. *Id.* at. 11-12.

6

      A.      **Eighth Amendment Conditions-Of-Confinement Claim**

The Eighth Amendment guarantees humane, but not necessarily comfortable, prisons. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (prison conditions can be "restrictive and even harsh" without violating the Constitution). Evaluation of claims under the Eighth Amendment calls for both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. The objective inquiry is satisfied if the "prisoner challenging the conditions of confinement [can] show that the conditions were sufficiently serious as an objective matter," which means that the prisoner experienced conditions that "denied the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety." *Thomas v. Blackard*, 2 F.4th 716, 719-20 (7th Cir. 2021) (cleaned up). The subjective component requires the prisoner to "prove that prison officials acted with deliberate indifference— that they knew of and disregarded this excessive risk of harm to the inmate." *Id.*

As noted, Gevas did not respond to the Wardens' motion for summary judgment, so he produced no evidence to support either prong of the analysis. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020) (explaining that, at summary judgment, "the non-moving party may not rest upon mere allegations in the pleadings . . . ; it must go beyond the pleadings and support its contentions with proper documentary evidence") (internal quotation marks and citations omitted). For their part, the Wardens have produced evidence of reasonable procedures within the facility to identify and prioritize repairs. Each Defendant Warden also stated that they were not aware that any of the maintenance issues alleged by Gevas posed a serious or substantial risk to any inmates' health or safety. [243-15] ¶ 10; [253-16] ¶ 6; [243-17] ¶ 9.

Setting aside the times that Gevas was quarantined during the COVID-19 pandemic, it is worth noting that Gevas experienced twelve cell moves over a two-and-a-half year period. The court is uncertain how this number compares with the moves other prisoners made, but Gevas

might argue that he was moved so often due to the conditions in the cells. He has offered no objective evidence of what conditions might have existed in his cells at the time of the moves, however, nor shown how long any adverse conditions existed. Thus, even construing the Wardens' facts in Gevas's favor, this single circumstance is not enough evidence to defeat summary judgment. See McCoy v. Harrison, 341 F.3d 600, 604 (7th Cir. 2003) ("mere speculation or conjecture will not defeat a summary judgment motion").

In short, on this record there is no dispute of material fact as to whether the Wardens knew of and disregarded an excessive risk of harm to Gevas's health or safety. See FED. R. CIV. P. 56(a). Consequently, the Wardens are entitled to judgment in their favor on Gevas's Eighth Amendment claim.

One final note: the Wardens have argued, in addition, that Gevas failed to produce evidence that their conduct caused him harm. The court need not address this argument in any length beyond observing that Gevas bears the burden of proof on this issue—that is, to prevail, Gevas would have to establish an injury stemming from the alleged conditions as well as a causal connection between the defendants' conduct and his injury. See Carmody v. Bd. of Tr. of Univ. of Ill., 893 F.3d 397, 401 (7th Cir. 2018); Meneweather v. Ritz, No. 24-1214, 2025 WL 66040, at *3 (7th Cir. Jan. 10, 2025) ("the plaintiff claiming injury has the burden to offer some evidence of causation"); see also Jackson v. Pollion, 733 F.3d 786, 790 (7th Cir. 2013) ("[T]here is no tort—common law, statutory, or constitutional—without an injury[.]"). Having declined to respond to the motion, Gevas has not satisfied this burden, either.

### A. State-Law Claims

"[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." Wright v. Associated Ins. Cos. Inc., 29 F.3d 1244, 1251 (1994). The Wardens in this case have not asked the court to enter summary judgment on the merits of the state-law claims.

They argue only that the Illinois Court of Claims has exclusive jurisdiction over "state law and institutional negligence claims," so the claims should be dismissed. [240] at 11-12. The court dismisses those claims without prejudice.

## **CONCLUSION**

The court grants Defendants' motion for summary judgment [240, 241]. As discussed above, Defendants are entitled to judgment as a matter of law on Gevas's claims under 42 U.S.C. § 1983. The court relinquishes jurisdiction over any state-law claims and dismisses those claims without prejudice. Final judgment will be entered in Defendants' favor. This case is closed.

ENTER:

Date: October 23, 2025

_____
REBECCA R. PALLMEYER
United States District Judge